IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| 1 WEST MAIN STREET, LLC, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | NO. 14-6967 |
| | : | |
| TOWER NATIONAL INS. CO., | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

**Jones, J.**                                                                                                   **March 15, 2016**

Now pending before the Court is Defendant's Motion for Summary Judgment (MSJ) (Dkt No. 16), including Defendant's Statement of Undisputed Material Facts (D.'s SUMF), Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (Resp.) (Dkt No. 18)[1], including Plaintiff's Response to Defendant's Statement of Facts (Pl.'s RSOF), Defendant's Reply in Support of Motion for Summary Judgment (Rep.) (Dkt No. 21).

Plaintiff filed a complaint in the Court of Common Pleas Philadelphia County alleging breach of contract (Compl.), Defendant removed to federal court based on diversity jurisdiction (Rem.) (Dkt No. 1).

For the reasons that follow, summary judgment will be granted.

**I.   Facts**

The Court recites the undisputed facts as viewed in the light most favorable to Plaintiff.

Plaintiff, 1 West Main Street, LLC, is a limited liability company that owns a five-story office building located at 1 West Main Street, Norristown, Pennsylvania. (D.'s SUMF ¶ 2; Pl.'s RSOF ¶ 2.) Defendant, Tower National Insurance Company, is a New York corporation. (Rem. at 1.) The managing member of the limited liability company is Ahmed Michael Alhadad. (D.'s SUMF ¶ 4; Pl.'s RSOF ¶ 4.) The property manager is Sam Madi. (D.'s SUMF ¶ 7; Pl.'s RSOF ¶ 7.) Mr. Madi is located in Louisiana and handles the "day-to-day operations of the business,"

---

[1] Plaintiff is reminded of the importance of paginating all submissions to the Court. The references to Plaintiff's submission are based on counting the number of pages with the page beginning "Matter Before the Court" considered page one.

1

"from following up with tenant issues to maintenance." (D.'s SUMF ¶ 8-9; Pl.'s RSOF ¶ 8-9; Madi Dep. at 5-6; Alhadad Dep. at 20.)

On January 9, 2014, "water was discharged from within a sprinkler, plumbing, or heating system resulting in damage to the insured premises and the contents thereof together with a consequential loss of use of the premises." (Compl. ¶ 4.) Defendant received notice of the loss on the evening of January 9, 2014, from Mr. Madi. (D.'s SUMF ¶ 17; Pl.'s RSOF ¶ 17.) Defendant denied Plaintiff's insurance claim on May 27, 2014. (D.'s SUMF ¶ 76; Pl.'s RSOF ¶ 76.)

1. *The Loss on January 9, 2014.*

At approximately 6:00pm on January 9, 2014, the Norristown Fire Department received notice of an automatic fire alarm at 1 West Main Street, Norristown, PA, 19401. (Fire Dept. Incident Report [hereinafter "Exhibit F"].) The Fire Department, led by Battalion Chief Richard Lockhart, responded at 6:04pm and found the alarm was coming from the basement and fifth floor. (D.'s SUMF ¶ 19-20; Pl.'s RSOF ¶ 19-20; Exhibit F.) "Investigation revealed a broken sprinkler pipe on the 5th floor and a broken pipe at the sprinkler riser leading to the fire pump [in the basement]." (D.'s SUMF ¶ 21; Pl.'s RSOF ¶ 21; Exhibit F.) The water supply to the sprinkler system was shut off to stop water from flowing to the broken pipes. (Exhibit F.)

Chief Lockhart's report states that Mr. Alhadad also responded to the alarm and identified himself as the owner of the building. (Exhibit F.) Chief Lockhart showed Mr. Alhadad and two of his maintenance staff the affected areas. (Exhibit F.) Mr. Alhadad stated the sprinkler company was on the way to the building as well. (Exhibit F.) Chief Lockhart then turned the property over to Mr. Alhadad. (Exhibit F.)[2]

2. *The Condition of the Building on January 9, 2014.*

Chief Lockhart is the only witness who admits to being present in the building the night of the alarm and has been deposed in this case. Chief Lockhart found that on the fifth floor, where the first leak occurred, there was a small utility sink where not only the water in the sink had frozen, but the running water coming out of the faucet had frozen into a straight line. (D.'s

---

[2] In his deposition, Mr. Alhadad denies being present the night of the incident. Given the inclusion of Mr. Alhadad in Chief Lockhart's report that night, the unlikeliness of Chief Lockhart otherwise knowing the owner of the building, and the absence of any reason for Chief Lockhart to fabricate such a fact, the Court finds that, even viewing the evidence in the light most favorable to Plaintiff, the only reasonable conclusion is that Mr. Alhadad was present that evening. Regardless, whether Mr. Alhadad was present that night is not a material fact as it has no bearing on the applicability of the contract exclusion and exception.

SUMF ¶ 22; Pl.'s RSOF ¶ 22; Lockhart Dep. at 17-18.) In the basement, where the other leak occurred, there was a wall where "there was nothing but mold on the wall," "it was floor to ceiling." (D.'s SUMF ¶ 26; Pl.'s RSOF ¶ 26; Lockhart Dep. 31-32.)

Chief Lockhart sent an email to Norristown's Fire Marshal that same evening informing the Marhsal that "the buildings [sic] heat was not turned on." (D.'s SUMF ¶ 28; Pl.'s RSOF ¶ 28; Lockhart-Sweeney Email [hereinafter "Exhibit J"].) Chief Lockhart further explained that Mr. Alhadad and his two maintenance workers "were trying to figure out [sic] to turn on the buildings [sic] heating system when we were leaving." (Exhibit J.) Chief Lockhart came to the conclusion that the heat was not on based on the temperature, the ice, a discussion with a tenant, and the fact that a team was trying to turn on the heat, but did not physically inspect the heaters. (D.'s SUMF ¶ 28; Pl.'s RSOF ¶ 28; Lockhart Dep. at 18.) First, Chief Lockhart felt that "it was very cold in there" although was unable to determine exactly how cold due to his equipment and physical exertion. (D.'s SUMF ¶ 30; Pl.'s RSOF ¶ 30; Lockhart Dep. at 18.) Second, "the frozen water in the sink" and "seeing ice." (D.'s SUMF ¶ 30; Pl.'s RSOF ¶ 30; Lockhart Dep. at 18.) Third, Chief Lockhart spoke with a tenant from the second floor who also said it was cold. (D.'s SUMF ¶ 30; Pl.'s RSOF ¶ 30; Lockhart Dep. at 18.) And, finally, Mr. Alhadad and his two staff "were trying to turn the heat back on." (D.'s SUMF ¶ 30; Pl.'s RSOF ¶ 30; Lockhart Dep. at 18.)

Mr. Alhadad denies being present at the building the night of the alarm, but visited the next day and noticed it was "very cold." (D.'s SUMF ¶ 31; Pl.'s RSOF ¶ 31; Alhadad Dep. at 43-44.) When he visited the next day, he does not remember whether he checked to see if the heat was on and does not know whether the heat was in fact on. (D.'s SUMF ¶ 31; Pl.'s RSOF ¶ 31; Alhadad Dep. at 43-44.) Mr. Alhadad did not answer questions directly in his deposition, but certainly creates the impression that the heat was not on; e.g. "Q. Is it possible the heat wasn't working? A. When I walked in the next day, it was – it was cold." (D.'s SUMF ¶ 32; Pl.'s RSOF ¶ 32; Alhadad Dep. at 69.) In addition, Mr. Madi, the property manager, did not know whether heat was being supplied to the fifth floor where the sprinkler leak occurred. (D.'s SUMF ¶ 35; Pl.'s RSOF ¶ 35; Madi Dep. at 36.)

  3. *The Results of Post-Loss Inspections.*

National Forensic Consultants ("NFC") was hired to investigate the status of heat in the property. (D.'s SUMF ¶ 33; Pl.'s RSOF ¶ 33.) NFC relied on sixteen separate documents, evidence retrieved by ONEIDA Fire Protection Inc, and four physical inspections that occurred

on January 16, 2014, January 28, 2014, February 27, 2014, and March 10, 2014. (Report of National Forensic Consultants [hereinafter "Exhibit K"].)[3] The five-story office building included a basement, a first floor bank – including a bank level and bank mezzanine, a second floor atrium level and office space, and then standard commercial space from the third to fifth floors. (D.'s SUMF ¶ 34-43; Pl.'s RSOF ¶ 34-43.) Mr. Alhadad, the principal of the LLC that owned the building, said that any questions regarding the heating system and utilities could be addressed to Mr. Madi, the property manager. (D.'s SUMF ¶ 35; Pl.'s RSOF ¶ 35; Alhadad Dep. at 12.) Mr. Madi, however, was unaware of how the building was heated or the status of those heating devices. (D.'s SUMF ¶ 35-40; Pl.'s RSOF ¶ 35-40; Madi Dep. at 36-39.)

Heat to the bank level, bank mezzanine, and atrium level, was to be supplied by a boiler in the basement. (D.'s SUMF ¶ 37; Pl.'s RSOF ¶ 37; Exhibit K.) The property manager, Mr. Madi, did not know how the lower floors were heated. (D.'s SUMF ¶ 36; Pl.'s RSOF ¶ 36; Madi Dep. at 38-39.) Mr. Madi did not know whether there was a boiler in the building or, if there was a boiler, whether it was working. (D.'s SUMF ¶ 40; Pl.'s RSOF ¶ 40; Madi Dep. at 40.) Mr. Alhadad likewise testified that he did not know if the heating system in the basement was operational on January 9, 2014. (D.'s SUMF ¶ 41; Pl.'s RSOF ¶ 41; Alhadad Dep. at 77-78.) NFC's inspection found that there was no water in the boiler and that the boiler was not operational. (D.'s SUMF ¶ 38; Pl.'s RSOF ¶ 38; Exhibit K.)

In the atrium level, there were also radiators. (D.'s SUMF ¶ 39; Pl.'s RSOF ¶ 39; Exhibit K.) The radiators had been capped off and therefore were not operational. (D.'s SUMF ¶ 39; Pl.'s RSOF ¶ 39; Exhibit K.) Plaintiff states that portable heaters had been placed in the first floor atrium prior to the incident. (Pl.'s RSOF ¶ 42.) Two additional portable heaters were added to the atrium after the incident. (D.'s SUMF ¶ 42; Pl.'s RSOF ¶ 42; Madi Dep. at 63-64.)

Heat to the second through fifth floors was to be supplied by six HVAC units located on the roof of the building. (D.'s SUMF ¶ 33; Pl.'s RSOF ¶ 33; Exhibit K.) Mr. Madi did not know whether the HVAC units on the roof were operational, nor did he know whether heat was being supplied to the unoccupied fifth floor. (D.'s SUMF ¶ 35; Pl.'s RSOF ¶ 35; Madi Dep. at 36.)

---

[3] Plaintiff states that the investigation has no bearing on whether the heat was operational in the building on January 9, 2014, because the physical inspection did not occur until one week later on January 16, 2014. (Pl.'s RSOF ¶ 33). At the same time, Plaintiff makes no claim that there is some intervening event that would explain the heat being operational on January 9, 2014, but not one week later on January 16, 2014. Therefore, the Court accepts the facts of that investigation here.

Only two of the six HVAC units were operational upon inspection on January 16, 2014. (D.'s SUMF ¶ 33; Pl.'s RSOF ¶ 33; Exhibit K.)

Plick & Associates was likewise hired to make a determination as to the heat in the building through a review of the gas utility bills. (D.'s SUMF ¶ 49-51; Pl.'s RSOF ¶ 49-51; Plick Report of April 16, 2014 [hereinafter "Exhibit Q"].) The Plick Report concluded that "based on the available utility bills insufficient heating was provided to the subject property during the December 2013 and January 2014 billing periods."[4] (D.'s SUMF ¶ 55; Exhibit Q.) Because the incident occurred in the midst of the January billing cycle and the heaters were turned on after the incident, it is not possible to determine exactly how cold it was in the building on the night of the incident. (Exhibit Q). Based on the data from December, the Plick Report conservatively estimates the temperature between 33 and 40 degrees. (D.'s SUMF ¶ 51; Pl.'s RSOF ¶ 51; Exhibit Q].) Plaintiff was informed by the sprinkler system company, Oneida, after the loss that in order to prevent freezing, a temperature of 40 degrees must be maintained throughout. (D.'s SUMF ¶ 56-57; Pl.'s RSOF ¶ 56-57; Oneida Inspection Report [hereinafter "Exhibit I"].) Mr. Alhadad recognized this requirement. (D.'s SUMF ¶ 58; Pl.'s RSOF ¶ 58; Alhadad Dep. at 62.)

The NFC Report recognized that "[a] huge percentage of the sprinkler system and sprinkler piping headers are located in the unheated roof loft above the fifth-floor ceiling. None of this sprinkler piping is heat-traced or insulated." (D.'s SUMF ¶ 471; Pl.'s RSOF ¶ 47; Exhibit K.) In addition, there was no anti-freeze present in the sprinkler system upon inspection on April 17, 2013.[5] (D.'s SUMF ¶ 46; Advanced Sprinkler Technologies Report [hereinafter "Exhibit O"].) After the loss, Prasa was hired to add insulation to the pipes. (D.'s SUMF ¶ 48; Pl.'s RSOF ¶ 48; Prasa Invoice [hereinafter "Exhibit H"].)

4. *The Status of the Building.*

As of January 9, 2014, only a portion of the second floor of the five-story building was occupied by tenants. (D.'s SUMF ¶ 13; Pl.'s RSOF ¶ 13; Alhadad Dep. at 30-31.) The remainder of the building was vacant. (D.'s SUMF ¶ 15; Pl.'s RSOF ¶ 15; Alhadad Dep. at 31.) Although a

---

[4] The Court notes that Plaintiff denies the conclusions stated in the Plick Report, but Plaintiff provides no counterfacts or other citations to the record that would create a material dispute of fact as to these conclusions. Nor does Plaintiff challenge the expertise of the expert. Therefore, the Court will consider the report undisputed.

[5] Again, Plaintiff denies this statement, but without any counterfacts or other citations to the record that would create a material dispute as to the fact. Plaintiff provides no facts whatsoever to indicate the presence of anti-freeze.

virtual charter school had previously occupied additional space in the building, the school left the building in July of 2013. (D.'s SUMF ¶ 14; Pl.'s RSOF ¶ 14; Alhadad Dep. at 31.)

Plaintiff is contemplating converting the vacant fourth and fifth floors of the building into condominiums. (D.'s SUMF ¶ 59; Pl.'s RSOF ¶ 59; Alhadad Dep. at 82.) On November 11, 2013, an architect created a floorplan for the vacant fourth and fifth floors. (Exhibit X.) In an email dated March 2, 2014, Mr. Madi states that the residential conversion of the fourth and fifth floors had been in motion since the tenant moved out in August 2013. (Exhibit Y.) On January 27, 2014, an application for a zoning permit was filed, three weeks after the loss. (D.'s SUMF ¶ 60; Pl.'s RSOF ¶ 60; Permit Application [hereinafter "Exhibit S"].)

No physical renovation work has been performed within the building. (D.'s SUMF ¶ 62; Pl.'s RSOF ¶ 62; Alhadad Dep. at 84-85.) As of the time of Mr. Alhadad's deposition, the work was set to begin in the summer of 2015. (D.'s SUMF ¶ 62; Pl.'s RSOF ¶ 62; Alhadad Dep. at 84-85.) That was not set in stone, however, as Mr. Alhadad was nonetheless willing to lease out space on the fourth and fifth floors as of the time of his deposition on April 9, 2015. (D.'s SUMF ¶ 63; Pl.'s RSOF ¶ 63; Alhadad Dep. at 88-89.)

5. *The Contract.*

Plaintiff contracted with Defendant for an insurance policy, Policy CPC 7037997, with effective dates of November 15, 2013 through November 15, 2014. (D.'s SUMF ¶ 64; Pl.'s RSOF ¶ 64; Tower Insurance Policy [hereinafter "Exhibit T"].)  The Policy was issued to "1 West Main St LLC" as a renewal of a prior policy. (D.'s SUMF ¶ 64-65; Pl.'s RSOF ¶ 64-65; Exhibit T.) The Policy included a Commercial Property coverage grant which provided the following:

> A. Coverage. We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

(D.'s SUMF ¶ 67-68; Pl.'s RSOF ¶ 67-68; Exhibit T.) The coverage was subject to "Loss Conditions," including a provision regarding Vacancy:

> E. Loss Conditions. The Following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.
>      6. Vacancy
>         a. Description of Terms
>             (1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:
>                 (a) [INAPPLICABLE]

>> (b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:
>>> (i) Rented to a lessee or sub-lessee and used by the lessee or sub-less to conduct its customary operations; and/or
>>> (ii) Used by the building owner to conduct customary operations.
>> (2) Buildings under construction or renovation are not considered vacant.
> b. Vacancy Provisions. If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:
>> (1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:
>>> (a) Vandalism;
>>> (b) Sprinkler leakage, unless you have protected the system against freezing;
>>> (c) Building glass breakage;
>>> (d) Water damage;
>>> (e) Theft; or
>>> (f) Attempted theft.

(D.'s SUMF ¶ 69-70; Pl.'s RSOF ¶ 69-70; Exhibit T.) In addition, a "Causes of Loss – Special Form" made part of the contract further specifies that:

> 2. We will not pay for loss or damage caused by or resulting from any of the following:
>> (a) – (f) [INAPPLICABLE]
>> (g) Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:
>>> (1) You do your best to maintain heat in the building or structure; or
>>> (2) You drain the equipment and shut off the supply if the heat is not maintained.

(D.'s SUMF ¶ 71-73; Pl.'s RSOF ¶ 71-73; Exhibit T.) The final exclusion cited by the parties is one that excludes coverage for "Fungus" which includes "any type or form of fungus, including mold or mildew," unless it results in a "specified cause of loss." (D.'s SUMF ¶ 74-75; Pl.'s RSOF ¶ 74-75; Exhibit T.)

The policy was cancelled on July 17, 2014, at the request of Plaintiff. (D.'s SUMF ¶ 66; Pl.'s RSOF ¶ 66; Exhibit T.)

## II. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted). Therefore, in order to defeat a motion for summary judgment, the non-movant must establish that the disputes are both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "At the summary judgment stage of proceedings, courts do not 'weigh the evidence or make credibility determinations,' but, instead, leave that task to the fact-finder at a later trial if the court denies summary judgment." *Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014) (quoting *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993)).

## III. Legal Standard

The Pennsylvania Supreme Court established a legal framework for evaluating claims by insureds against insurers in *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595 (1999). Because this Court sits in diversity over the present breach of contract claim brought under Pennsylvania law, the Pennsylvania Supreme Court's approach is appropriately applied here. *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) (directing a federal court sitting in diversity to apply state law).

Under Pennsylvania law, an insurer usually bears the burden of proving an exclusion to coverage, but the insured has the burden of proving an exception to an exclusion. *N. Ins. Co. of New York v. Aardvark Associates, Inc.*, 942 F.2d 189, 194-95 (3d Cir. 1991); *see also Madison*

*Const. Co.*, 557 Pa. at 605 ("Where an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such defense."). "To determine whether [the insurer] has met its burden of proof, we rely on well-settled principles of contract interpretation." *Madison Const. Co.*, 557 Pa. at 605. Contractual language is only ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Co.*, 513 Pa. 192, 201 (1986). The Court must not distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity. *Steuart v. McChesney*, 498 Pa. 45, 53 (1982). "Words of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense, and we may inform our understanding of these terms by considering their dictionary definitions." *Madison Const. Co.*, 557 Pa. at 608.

**IV.   Discussion**

    A.  <u>The Building Was Vacant And Therefore The Vacancy Provision Applies</u>

Plaintiff's Policy excludes various causes of loss from coverage in the event that the building is vacant. (D.'s SUMF ¶ 69-70; Pl.'s RSOF ¶ 69-70; Exhibit T.) The Policy specifically defines the term "vacant" as follows:

> (1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:
>> (b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:
>>> (i) Rented to a lessee or sub-lessee and used by the lessee or sub-less to conduct its customary operations; and/or
>>> (ii) Used by the building owner to conduct customary operations.
>
> (2) Buildings under construction or renovation are not considered vacant.

(Exhibit T, T0961.) Therefore, if less than 31% of the building was in use for customary operations and the building was neither under construction nor renovation, then the building is vacant for purposes of the policy.

        *1.  <u>The Building Was Vacant Because Less Than 31% Of The Square Footage Was In Use</u>*

Less than 31% of the five-story building was in use for customary operations. As of January 9, 2014, the date of loss, only a portion of the second floor of the five-story building was

occupied by tenants. (D.'s SUMF ¶ 13; Pl.'s RSOF ¶ 13; Alhadad Dep. at 30-31.) The remainder of the building was vacant. (D.'s SUMF ¶ 15; Pl.'s RSOF ¶ 15; Alhadad Dep. at 31.) Although a virtual charter school had previously occupied additional space in the building, the school left the building in July of 2013. (D.'s SUMF ¶ 14; Pl.'s RSOF ¶ 14; Alhadad Dep. at 31.) Therefore, it is undisputed that less than 20% of building was in use for customary operations, far less than the nearly 31% required.

### 2. The Building Was Vacant Because It Was Not Under Construction Or Renovation

Plaintiff claims that the building was not vacant because it was "under construction or renovation." (Resp. 6.) The term "renovation" is not defined in the contract. Plaintiff argues that "renovation" is an ambiguous term and therefore creates a genuine issue of material fact as to its proper construction and application. (Resp. 6-10.) As an initial matter, the Court notes that "the task of interpreting [an insurance] contract is generally performed by a court rather than by a jury." *Gene & Harvey Builders v. Pennsylvania Mfrs. Ass'n*, 512 Pa. 420, 426, 517 A.2d 910, 913 (1986) (quoting *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 304-05, 469 A.2d 563, 566 (1983)). When interpreting the contract, the court looks to the plain meaning of the terms. *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 608 (1999) ("Words of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense, and we may inform our understanding of these terms by considering their dictionary definitions.") Here, Plaintiff notes, and the Court agrees, that the Merriam-Webster Dictionary definition of "renovation" is "to make changes and repairs to (an old house, building, room, etc.) so that it is back in good condition." Merriam-Webster Online Dictionary, 2015, http://www.merriam-webster.com/dictionary/renovate (Mar. 1, 2016).

The Pennsylvania Supreme Court has been clear that courts must not "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Madison Const. Co.*, 557 Pa. at 606 (citing *Steuart v. McChesney*, 498 Pa. 45, 53 (1982)). "[C]ontractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Id.* Therefore, the Court must determine whether the term "under renovation" as commonly defined is subject to more than one *reasonable* interpretation when applied to the set of facts in this case.

10

At the time of the loss, blueprints for converting the fourth and fifth floors into residences had been drawn on October 15, 2013, November 11, 2013, and December 7, 2013. (Exhibit X.) Aside from the blueprints labeled "Proposed Condominium," there is nothing in the record to show that any steps to finalize such a renovation were made prior to the loss. (Exhibit X.) An application for a zoning permit was not filed until January 27, 2014, three weeks after the loss. (D.'s SUMF ¶ 60; Pl.'s RSOF ¶ 60; Permit Application [hereinafter "Exhibit S"].) No work toward the conversion had begun in the building before the loss and was not set to begin until the summer of 2015. (D.'s SUMF ¶ 62; Pl.'s RSOF ¶ 62; Alhadad Dep. at 84-85.)  In the meantime, Mr. Alhadad was even still willing to lease out the space on the fourth and fifth floors despite the plans. (D.'s SUMF ¶ 62-63; Pl.'s RSOF ¶ 62-63; Alhadad Dep. at 84-89.)

While the Court can easily imagine a case where the term "under renovation" is ambiguous – the contractors have gotten all of their supplies ready outside the building but are returning the next day to enter the building and make changes – the facts of this case are much clearer.  No changes and repairs had been made. (D.'s SUMF ¶ 62; Pl.'s RSOF ¶ 62; Alhadad Dep. at 84-85.) No permit to allow Plaintiff to make changes and repairs had been requested. (Exhibit S.) No building permit to allow Plaintiff to make changes and repairs had been granted. (Exhibit S.) Mr. Alhadad was still willing to lease out the space in the building despite the planned renovation. (D.'s SUMF ¶ 62-63; Pl.'s RSOF ¶ 62-63; Alhadad Dep. at 84-89.) Furthermore, Plaintiff had not taken other critical steps necessary for renovation such as requesting a zoning permit, acquiring a business license, seeking permission from the Historic Architectural Review Board, and obtaining a Use and Occupancy Inspection. (Exhibit S.)

Plaintiff argues that the building was not vacant because "[a]t the time of the loss, 1 West Main Street, LLC was planning to convert the upper floors of the building into residential condominiums . . ." (Resp. 2.) While the presence of blueprints certainly demonstrates that Plaintiff planned to renovate the building, these plans did not actually change or repair the building in any manner so as to bring it "under renovation." Simply having *plans* to make changes or repairs does not equate to being "under renovation," especially when the permits necessary to make such changes or repairs have not even been sought. As a result, the term "under renovation" is not ambiguous as applied to the facts of this particular case; it is evident that the building was not yet under renovation.

*3. The Building Was Vacant For More Than Sixty Days Before The Loss*

The vacancy provision is applicable because the building had been vacant for more than sixty consecutive days prior to the loss. No change or repair had occurred within 60 days of the loss and the last tenants had moved out in July of 2013, far more than 60 days before the loss. (D.'s SUMF ¶ 14, 62; Pl.'s RSOF ¶ 14, 62; Alhadad Dep. at 31; 84-85.) Defendant has thus met its burden of demonstrating the applicability of the exclusion at hand. Therefore, the vacancy provision applies and Defendant "will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss: (a) Vandalism; (b) Sprinkler leakage, unless you have protected the system against freezing; (c) Building glass breakage; (d) Water damage; (e) Theft; or (f) Attempted theft." (D.'s SUMF ¶ 69-70; Pl.'s RSOF ¶ 69-70; Exhibit T.)

B.  The Sprinkler System Was Not Protected Against Freezing

Once Defendant has met its burden of proving the applicability of the exclusion based on vacancy, Plaintiff has the burden of proving an exception to the exclusion – specifically that Plaintiff has "protected the system against freezing." *Northern Ins. Co. v. Aardvark Assocs.*, 942 F.2d 189, 195 (3d Cir. 1991). Plaintiff sets forth three arguments as to this point: (1) the building was occupied and therefore heat was maintained to ensure the building could be occupied, (2) space heaters were placed in the building to supplement the heating system, and (3) Plick and Associates found that the gas usage was marginally sufficient to maintain an indoor temperature between 33 and 40 degrees, which is above freezing. (Resp. 11.)

Even taking all of the statements above as true, none of these arguments demonstrate the sprinkler system was protected against freezing. In fact, neither Mr. Alhadad nor the property manager, Mr. Madi, knew how the building was heated, whether the heaters were working, or even whether the heaters were on at the time of the loss, thus undermining Plaintiffs first argument. (D.'s SUMF ¶ 3, 35-36, 41; Pl.'s RSOF ¶ 31, 35-36, 41; Alhadad Dep. at 43-44, 77-78; Madi Dep. at 36, 40.) In addition, the tenants reported that the building was cold. (D.'s SUMF ¶ 30; Pl.'s RSOF ¶ 30; Lockhart Dep. at 18.) Furthermore, the portable heaters on which Plaintiff relies for its second argument included just two portable heaters placed on the first floor, far from the fifth floor where the sprinkler leakage occurred. (Pl.'s RSOF ¶ 42.) Finally, even if the gas usage was sufficient to maintain the temperature between 33 and 40 degrees in the building generally, Plaintiff ignores the fact that "[a] huge percentage of the sprinkler system and

sprinkler piping headers are located in the unheated roof loft above the fifth-floor ceiling. None of this sprinkler piping is heat-traced or insulated." (D.'s SUMF ¶ 471; Pl.'s RSOF ¶ 47; Exhibit K.) Therefore, even taking Plaintiff's three arguments as true, none demonstrate that the sprinkler was protected against freezing.

Even if Plaintiff could provide evidence to show it took some steps to prevent freezing, Defendant provided overwhelming evidence showing that the sprinkler system was not protected against freezing. The building was inspected by National Forensic Consultants one week after the incident and the inspection demonstrated that the boiler intended to heat the basement and first floor was not operational, the radiators on the first floor were not operational, and only two of the six HVAC units on the roof intended to heat floors two through five were operational. (D.'s SUMF ¶ 33, 38-39; Pl.'s RSOF ¶ 33, 38-39; Exhibit K.) Plaintiff argues that this has no bearing on whether the heat was operational at the time of the loss one week prior. In order to overcome summary judgment once Defendant has set forth such facts, however, Plaintiff must actually point to facts in the record to counter Defendant's evidence. There is no evidence that an intervening act would permit the heaters to work at the time of the loss, but prevent them from working just one week later. As a result, there is no material dispute of fact that only two HVAC units worked, while all remaining forms of heat were not operational.

Plaintiff relies on the Plick and Associates report to demonstrate that the gas usage could allow for a temperature between 33 and 40 degrees and therefore the building was not freezing. Again, this does not demonstrate that the sprinkler system in particular was protected against freezing because the Plick report addresses the building as a whole and not specifically the fifth floor where the sprinkler leakage occurred. To the contrary, Chief Lockhart, the firefighter who responded to the alarm on the night of the loss, reported that on the fifth floor where the sprinkler leakage occurred there was also a utility sink with water that had frozen coming out of the faucet and into the basin. (D.'s SUMF ¶ 22; Pl.'s RSOF ¶ 22; Lockhart Dep. at 17-18.) The frozen water demonstrates that the fifth floor was freezing, even without considering the fact that the sprinkler system was in an unheated roof loft above the fifth floor ceiling. (D.'s SUMF ¶ 471; Pl.'s RSOF ¶ 47; Exhibit K.)

Plaintiff next argues that just because it was in fact freezing does not mean that Plaintiff did not protect the sprinkler system against freezing. But even if the heaters were all operational, the sprinkler system was located in an unheated roof loft therefore requiring further efforts to protect

13

against freezing. (D.'s SUMF ¶ 471; Pl.'s RSOF ¶ 47; Exhibit K.) Upon inspection on April 17, 2013, there was no anti-freeze present in the sprinkler system. (D.'s SUMF ¶ 46; Advanced Sprinkler Technologies Report [hereinafter "Exhibit O"].) Plaintiff again argues that even though there was no anti-freeze in April there could have been anti-freeze at the time of the loss. Despite this argument, Plaintiff does not set forth a single fact demonstrating that there was anti-freeze in the sprinkler system at the time of the loss or that there is some explanation as to why anti-freeze would have been present at the time of the loss but not the inspection. In addition, the sprinkler piping was neither heat-traced nor insulated at the time of the loss. (D.'s SUMF ¶ 471; Pl.'s RSOF ¶ 47; Exhibit K.)

Defendant successfully carried its burden of proving the vacancy exception applied. Plaintiff now has the burden to prove an exclusion to the exception, namely that Plaintiff protected the sprinkler system against freezing. *Fischer & Porter Co. v. Liberty Mut. Ins. Co.*, 656 F. Supp. 132, 140 (E.D. Pa. 1986) (quoting 19 G. Couch, *Couch On Insurance 2d* § 79.385, at 338) ("when a policy contains an exception within an exception, the insurer need not negative the internal exception; rather the insured must show that the exception from the exemption from liability applies"). The overwhelming evidence set forth by Defendant demonstrating that the sprinkler system was not protected against freezing precludes Plaintiff from carrying its burden. The persons responsible for maintaining the building did not know how the building was heated, whether the heat was operational, or whether the heat was turned on, the sprinkler was located in an unheated loft where it was not protected from freezing with insulation, heat-tracing, or anti-freeze. The Court agrees with Plaintiff that simply because the sprinkler froze does not mean that it was unprotected against freezing. But in this case, the sprinkler was left wholly unprotected and therefore the exclusion must apply without exception.

  C. <u>Water Damage Resulting From Sources Other Than The Sprinkler Is Excluded</u>

To the extent that Plaintiff claims that water damage resulted from sources other than the fire sprinkler, Plaintiff is excluded from coverage under the contract. First, because the building was vacant for sixty days before the loss, the contract specifically states that Defendant "will not pay for any loss or damage caused by . . . (d) water damage." (D.'s SUMF ¶ 69-70; Pl.'s RSOF ¶ 69-70; Exhibit T.) Second, even if the vacancy provision did not apply, Plaintiff could only

recover for water damage caused by freezing if Plaintiff did its "best to maintain heat in the building or structure." (D.'s SUMF ¶ 71-73; Pl.'s RSOF ¶ 71-73; Exhibit T.)

Considering that Plaintiff was unaware of how the building was heated, whether the heaters were operational, or even if the heaters were turned on, Plaintiff cannot establish that it did its *best* to maintain heat. (D.'s SUMF ¶ 3, 35-36, 41; Pl.'s RSOF ¶ 31, 35-36, 41; Alhadad Dep. at 43-44, 77-78; Madi Dep. at 36, 40.) And, in fact, heat was not maintained in the building. The boiler to heat the lower floors contained no water and was not operational. (D.'s SUMF ¶ 38; Pl.'s RSOF ¶ 38; Exhibit K.) The radiators in the atrium were not operational and had been replaced with just two portable heaters. (D.'s SUMF ¶ 39, 42; Pl.'s RSOF ¶ 39, 42; Exhibit K; Madi Dep. at 63-64.) Of the six HVAC units to heat the second through fifth floors, only two of those units were operational. (D.'s SUMF ¶ 33; Pl.'s RSOF ¶ 33; Exhibit K.) As a result, a five-story building that is ordinarily heated by a boiler, radiators, and six HVAC units was instead operating in the height of winter with just two portable heaters and two HVAC units. There is no evidence that this constitutes Plaintiff's best efforts to maintain heat in the building. Therefore, Plaintiff cannot recover for water damage caused by the plumbing or heating system.

## CONCLUSION

Based on the foregoing analysis, summary judgment is granted in favor of Tower National Insurance Company and against 1 West Main Street LLC.

An appropriate order follows.

BY THE COURT:

/s/ C. Darnell Jones, II
C. DARNELL JONES, II    J.